## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
## MARSHALL DIVISION

| | |
|---|---|
| NETLIST, INC. | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| **SAMSUNG ELECTRONICS CO., LTD.,** | ) |
| **SAMSUNG ELECTRONICS AMERICA,** | ) |
| **INC., SAMSUNG SEMICONDUCTOR,** | )   Case No. 2:25-cv-557-JRG |
| **INC.; AVNET, INC.,** | ) |
| Defendants. | )   JURY TRIAL DEMANDED |
| | )   (Lead Case) |
| | ) |
| NETLIST, INC. | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| **MICRON TECHNOLOGY, INC.,** | ) |
| **MICRON SEMICONDUCTOR** | ) |
| **PRODUCTS, INC., MICRON** | )   Case No. 2:25-cv-558-JRG |
| **TECHNOLOGY TEXAS LLC; AVNET,** | ) |
| **INC.,** | )   JURY TRIAL DEMANDED |
| | )   (Member Case) |
| Defendants. | ) |

## FIRST AMENDED COMPLAINT

1.      Plaintiff Netlist, Inc. ("Netlist"), by its undersigned counsel, brings this First Amended Complaint against defendants Samsung Electronics Co., Ltd. ("SEC"), Samsung Electronics America, Inc. ("SEA"), and Samsung Semiconductor, Inc. ("SSI") (collectively, "Samsung") and Avnet, Inc. ("Avnet") (collectively, "Defendants") for infringement of U.S. Patent Nos. 12,308,087 ("the '087 Patent," Ex. 1) and 10,025,731 ("the '731 Patent," Ex. 2).

I.     **THE PARTIES**

2.     Plaintiff Netlist is a corporation organized and existing under the laws of the State of Delaware, having a principal place of business at 111 Academy Way, Suite 100, Irvine, CA 92617.

3.     On information and belief, SEC is a corporation organized and existing under the laws of the Republic of Korea, with its principal place of business at 129 Samsung-ro, Yeongtong-gu, Suwon, Gyeonggi-Do, 443-742, Republic of Korea.  On information and belief, SEC is the worldwide parent corporation for SEA and SSI, and is responsible for the infringing activities identified in this Complaint.  On information and belief, SEC's Device Solutions division is involved in the design, manufacture, use, offering for sale and/or sales of certain semiconductor products, including the Accused Instrumentalities as defined below.  On information and belief, SEC is also involved in the design, manufacture, and provision of products sold by SEA.

4.     On information and belief, SEA is a corporation organized and existing under the laws of the State of New York.  On information and belief, SEA, collectively with SEC, operates the Device Solutions division, which is involved in the design, manufacture, use, offering for sale and/or sales of certain semiconductor products, including the Accused Instrumentalities as defined below.  Defendant SEA maintains facilities at 6625 Excellence Way, Plano, Texas 75023.  SEA may be served with process through its registered agent for service in Texas: CT Corporation System, 1999 Bryan Street, Suite 900, Dallas, Texas 75201.  SEA is a wholly owned subsidiary of SEC.

5.     On information and belief, SSI is a corporation organized and existing under the laws of the State of California.  On information and belief, SSI, collectively with SEC, operates the Device Solutions division, which is involved in the design, manufacture, use, offering for sale and/or sales of certain semiconductor products, including the Accused Instrumentalities as defined

below.  On information and belief, Defendant SSI maintains facilities at 6625 Excellence Way, Plano, Texas 75023.  Defendant SSI may be served with process through its registered agent National Registered Agents, Inc., 1999 Bryan St., Ste. 900, Dallas, TX 75201-3136.   On information and belief, SSI is a wholly owned subsidiary of SEA.

6.     On information and belief, Avnet is a corporation organized and existing under the laws of New York. On information and belief, Avnet is involved in the use, offering for sale and/or sales of certain semiconductor products, including the Accused Instrumentalities as defined below. On information and belief, Avnet has a regular and established place of business at 3101 E. President George Bush Highway, Suite 250, Richardson, TX 75082. On information and belief, Avnet is registered with the Texas Secretary of State to do business in Texas.  On information and belief, Avnet can be served through its registered agent, The Corporation Service Company, 211 E. 7th Street, Suite 620, Austin, Texas, 78701-3218.

7.     On information and belief, Defendants have used, sold, or offered to sell products and services, including the Accused Instrumentalities, in this judicial district.

## II.    JURISDICTION AND VENUE

8.     Subject matter jurisdiction is based on 28 U.S.C. § 1338, in that this action arises under federal statute, the patent laws of the United States (35 U.S.C. §§ 1, *et seq.*).

9.     Each Defendant is subject to this Court's personal jurisdiction consistent with the principles of due process and/or the Texas Long Arm Statute.

10.    Personal jurisdiction exists generally over the Defendants because each Defendant has sufficient minimum contacts and/or has engaged in continuous and systematic activities in the forum as a result of business conducted within the State of Texas and the Eastern District of Texas. Personal jurisdiction also exists over each Defendant because each, directly or through subsidiaries, makes, uses, sells, offers for sale, imports, ships, distributes, advertises, makes

available, and/or markets products within the State of Texas and the Eastern District of Texas that infringe one or more claims of the Patents-in-Suit.  Further, on information and belief, Defendants have placed or contributed to placing infringing products into the stream of commerce, both directly and through intermediaries (including distributors, retailers, authorized dealers, sales agents, and other individuals or entities), knowing or understanding that such products would be sold and used in the United States, including in this District.

11.    Venue is proper in this Court pursuant to 28 U.S.C. §§ 1391(b) and (c) and/or 1400(b).  For example, SEC maintains a regular and established place of business in this judicial district at 6625 Excellence Way, Plano, Texas 75023 and has committed acts of infringement in this judicial district.  As another example, SEA maintains a regular and established place of business in this judicial district at 6625 Excellence Way, Plano, Texas 75023 and has committed acts of infringement in this judicial district.  Venue is also proper for SSI because it maintains a regular and established place of business in this judicial district at 6625 Excellence Way, Plano, Texas 75023 and has committed acts of infringement in this judicial district.

12.    Venue is also proper for Avnet because it maintains a regular and established place of business in this judicial district at 3101 E. President George Bush Highway, Suite 250, Richardson, TX 75082 and has committed acts of infringement in this judicial district. Specifically, Avnet offers for sale and distributes its products, including the Accused Instrumentalities supplied by Samsung, all throughout the United States, including the State of Texas and the Eastern District of Texas. Ex. 11. Avnet's website, https://www.avnet.com/americas/, has an (800) contact number that prospective customers can call to obtain more information or a quote for the Accused Instrumentalities (and other products). Avnet's website also specifically targets customers in Texas, including those in the Eastern District of Texas, by providing region-specific email contact, including dallas@avnet.com.

13.     Therefore, Samsung, together with Avnet as the distributor of the Accused Instrumentalities, have offered to sell, have sold, and have intentionally and voluntarily placed infringing products into the stream of commerce with the expectation and understanding that those products will be sold, purchased, and/or used by its customers in the State of Texas, including the Eastern District of Texas.

14.     Defendants have not contested venue in this District.  *See, e.g.*, Answer at ¶ 10, *Arbor Global Strategies LLC v. Samsung Elecs. Co., Ltd.*, No. 2:19-cv-333, Dkt. 43 (E.D. Tex. Apr. 27, 2020); Answer at ¶ 29, *Acorn Semi, LLC v. Samsung Elecs. Co., Ltd.*, No. 2:19-cv-347, Dkt. 14 (E.D. Tex. Feb. 12, 2020).  Nor have Defendants contested venue in any of the prior actions between the parties in this district.  *See Netlist, Inc. v. Samsung Elecs. Co. Ltd.*, No. 2:21-cv-463 (E.D. Tex.) ("*Samsung I*"), *Netlist, Inc. v. Samsung Elecs. Co. Ltd.*, No. 2:21-cv-293 (E.D. Tex.) ("*Samsung II*").

## III.    FACTUAL ALLEGATIONS

### A.     Background

15.     Since its founding in 2000, Netlist has been a leading innovator in high-performance memory module technologies.  Netlist designs and manufactures a wide variety of high-performance products for the cloud computing, virtualization and high-performance computing markets.  Netlist's technology enables users to derive useful information from vast amounts of data in a shorter period of time.  These capabilities will become increasingly valuable as the volume of data continues to dramatically increase.  Netlist has secured multiple jury verdicts confirming the commercial success of its inventions.  For example, in 2023, a jury in the Eastern District of Texas found that Samsung willfully infringed five Netlist patents and awarded Netlist $303.15 million in damages.  *See Netlist, Inc. v. Samsung Elecs. Co., Ltd.*, No. 2:21-cv-463, Dkt. 479.  As another example, in 2024, a jury in the Eastern District of Texas awarded Netlist $445

million in damages against Micron, another dominant memory module manufacturer.  *See Netlist, Inc. v. Micron Technology Texas, LLC*, No. 2:22-cv-294, Dkt. 135.  And in November 2024, a jury in the Eastern District of Texas found that Samsung willfully infringed three other Netlist patents and awarded Netlist $118 million in damages.  *See Netlist, Inc. v. Samsung Elecs. Co., Ltd.*, No. 2:22-cv-293, Dkt. 847.

16.     Netlist has a long history of being the first to market with disruptive new products such as the first load-reduced dual in-line memory module ("LR-DIMM"), HyperCloud®, based on Netlist's distributed buffer architecture later adopted by the industry for DDR4 LRDIMM. Netlist was also the first to bring NAND flash to the memory channel with its NVvault® NVDIMM.  Netlist's pioneering NVDIMM products utilized the same on-module power management technology found on newer-generation DDR5 DIMMs.  These innovative products built on Netlist's early pioneering work in areas such as embedding passives into printed circuit boards to free up board real estate, doubling densities via quad-rank double data rate (DDR) technology, and other off-chip technology advances that result in improved performance and lower costs compared to conventional memory.

17.     In many commercial products, a memory module is a printed circuit board that contains, among other components, a plurality of individual memory devices (such as DRAMs). The memory devices are typically arranged in "ranks," which are accessible by a processor or memory controller of the host system.  A memory module is typically installed into a memory slot on a computer motherboard.

18.     Memory modules are designed for, among other things, use in servers such as those supporting cloud-based computing and other data-intensive applications.  Memory modules are typically characterized by, among other things, the generation of DRAM on the module (*e.g.*, DDR5, DDR4, DDR3) and the type of module (*e.g.*, RDIMM, LRDIMM).

**B.    The '087 Patent**

19.    The '087 Patent is entitled "Memory Package Having Stacked Array Dies and Reduced Driver Load," and was filed on March 14, 2022 and assigned to Netlist, Inc.  The '087 Patent issued on May 20, 2025 and claims priority to, among others, U.S. Application No. 13/288,850, filed Nov. 3, 2011, and U.S. Provisional No. 61/409,893, filed November 3, 2010.

20.    Claim 1 of the '087 Patent provides:

**[1pre]** A dynamic random access memory (DRAM) package, comprising:

**[1a]** stacked DRAM dies including at least a first plurality of DRAM dies and a second plurality of DRAM dies, each DRAM die of the stacked DRAM dies including C/A ports, data ports and DRAM memory cells, wherein the each DRAM die is configurable to transfer data between the data ports and the DRAM memory cells;

**[1b]** terminals including command and/or address (C/A) terminals and data terminals, wherein the DRAM package is configured to receive C/A signals via the C/A terminals and is further configured to receive or output data signals via the data terminals in response to the (C/A) signals, wherein the DRAM package is configured to output first data signals in response to a first set of C/A signals associated with a memory read operation and to receive second data signals in response to a second set of C/A signals associated with a memory write operation;

**[1c]** die interconnects including C/A interconnects and data interconnects, the C/A interconnects including at least first C/A interconnects and second C/A interconnects, the first C/A interconnects configured to conduct the first set of C/A signals and the second set of C/A signals, the data interconnects including at least first data interconnects and second data interconnects, the first data interconnects configured to conduct the first data signals and the second data signals, each of the die interconnects including one or more through silicon vias (TSVs) in one or more DRAM dies in the stacked DRAM dies and configured to conduct signals to and/or from the one or more DRAM dies in the stacked DRAM dies through the one or more TSVs;

**[1d]** a control die coupled between the terminals and the stacked DRAM dies, the control die including conduits, the conduits including C/A conduits and data conduits, the C/A conduits including at least first C/A conduits coupled to respective ones of the first C/A interconnects and second C/A conduits coupled to

respective ones of the second C/A interconnects, the data conduits including at least first data conduits coupled to respective ones of the first data interconnects and second data conduits coupled to respective ones of the second data interconnects;

**[1e]** wherein a first C/A interconnect of the first C/A interconnects is in electrical communication with corresponding C/A ports on the first plurality of DRAM dies and not in electrical communication with any C/A port on any of the second plurality of DRAM dies;

**[1f]** wherein a second C/A interconnect of the second C/A interconnects is in electrical communication with corresponding C/A ports on the second plurality of DRAM dies and not in electrical communication with any C/A port on any of the first plurality of DRAM dies;

**[1g]** wherein a first data interconnect of the first data interconnects is in electrically communication with corresponding data ports on the first plurality of DRAM dies and not in electrical communication with any data port on any of the second plurality of DRAM dies, each of the first data interconnects including a first respective set of TSVs, the first respective set of TSVs including a TSV in each DRAM die of the first plurality of DRAM dies and at least one TSV in at least one DRAM die of the second plurality of DRAM dies, wherein the TSV in the each DRAM die of the first plurality of DRAM dies is in electrical communication with a corresponding data port on the each DRAM die, and wherein the at least one TSV in the at least one DRAM die of the second plurality of DRAM dies is not in electrical communication with any data port on the at least one DRAM die;

**[1h]** wherein a second data interconnect of the second data interconnects is in electrical communication with corresponding data ports on the second plurality of DRAM dies and not in electrical communication with any data port on any of the first plurality of DRAM dies;

**[1i]** wherein a first conduit of the first data conduits is coupled between the first data interconnect and a first data terminal of the data terminals, and a second conduit of the second data conduits is coupled between the second data interconnect and the first data terminal;

**[1j]** wherein the control die further includes control logic configurable to control respective states of the first and second conduits in response to one or more C/A signals received via one or more of the C/A terminals, wherein the one or more C/A signals do not include any chip select signal;

**[1k]** wherein the die interconnects further include first unidirectional interconnects configured to conduct signals from one or more DRAM dies of the stacked DRAM dies to the control die and not configured to conduct any signal from the control die to any of the stacked DRAM dies;

**[1l]** wherein the die interconnects further include second unidirectional interconnects configured to conduct signals from the control die to one or more DRAM dies of the stacked DRAM dies and not configured conduct any signal from any of the stacked DRAM dies to the control die;

**[1m]** wherein the control die is configured to receive signals from one or more DRAM dies of the stacked DRAM dies via the first unidirectional interconnects and is not configured to drive any signal to any of the stacked DRAM dies via any of the first unidirectional interconnects;

**[1n]** wherein the control die is configured to drive signals to one or more DRAM dies of the stacked DRAM dies via the second unidirectional interconnects and is not configured to receive any signal from any of the stacked DRAM dies via any of the second unidirectional interconnects; and

**[1o]** wherein the control die is configured to, in response to the first set of C/A signals, receive first signals associated with the memory read operation from a DRAM die of the stacked DRAM dies via the first unidirectional interconnects, and in response to the second set of C/A signals, drive second signals associated with the memory write operation to one or more DRAM dies of the stacked DRAM dies via the second unidirectional interconnects.

**C.    The '731 Patent**

21.    The '731 Patent is entitled "Memory Module And Circuit Providing Load Isolation And Noise Reduction."

22.    Claim 1 of the '731 Patent provides:

**[1a]** A memory module operable to communicate data with a system memory controller via a memory bus in response to address and control signals from the system memory controller, comprising:

**[1b]** a printed circuit board comprising at least one connector configured to be operatively coupled to the memory bus, the at least one connector including a

plurality of edge connections distributed along one or more edges of the printed circuit board;

**[1c]** a plurality of memory devices on the printed circuit board, the plurality of memory devices being arranged in multiple ranks, each rank comprising an independent set of memory devices that can be accessed by the system memory controller to access a full bit-width of the memory bus;

**[1d]** at least one circuit coupled between the at least one connector and the plurality of memory devices, the at least one circuit comprising a first set of port connections coupled to respective ones of the plurality of edge connections and a second set of port connections coupled to the plurality of memory devices;

**[1e]** each circuit of the at least one circuit further comprising a set of correction circuits, each correction circuit of the set of correction circuits being configured to make corrections in one or more signals transmitted between a respective port connection of the first set of port connections and a corresponding port connection in the second set of port connections;

**[1f]** the each correction circuit of the set of correction circuits including at least one programmable impedance matching circuit; and

**[1g]** control circuitry configured to receive the address and control signals from the system memory controller and to control the plurality of memory devices in response to the address and control signals, wherein the control circuitry is further configured to dynamically control the at least one programmable impedance matching circuit in the each correction circuit of the set of correction circuits in the each circuit of the at least one circuit based on which of the multiple ranks is selected to communicate data with the system memory controller in response to the address and control signals.

23.     Netlist owns by assignment the entire right, title, and interest in and to the '731 Patent. The '731 Patent was filed as Application No. 14/715,491 on May 18, 2015, issued as a patent on July 17, 2018 and claims priority to, among others, U.S. Application No. 14/324,990, filed on July 7, 2014, Application No. 13/412,243, filed on Mar. 5, 2012, Application No. 12/422,853, filed on Apr. 13, 2009, as well as three provisional applications filed on April 14, 2008 (Nos. 61/044,839, 61/044,825, and 61/044,801).

24.    Samsung had pre-suit knowledge of the '731 Patent.  For example, Samsung has had knowledge of the '731 Patent via notice of U.S. Patent No. 9,037,809 on August 2, 2021 through Samsung's access to Netlist's patent portfolio docket.  Samsung has also gained knowledge of the '731 Patent via this Complaint.

### D.    Defendants' Infringing Activities

25.    Samsung is a global technology company and one of the largest manufacturers of semiconductor memory products such as DRAM, NAND Flash, and MCP (Multi-Chip Package) such as high-bandwidth memories ("HBM").  Samsung develops, manufactures, sells, offers to sell, and imports into the United States memory components and memory modules designed for, among other things, use in servers such as those supporting cloud-based computing and other data-intensive applications.

26.    Samsung and Netlist were initially partners under a 2015 Joint Development and License Agreement ("JDLA"), which granted Samsung a 5-year paid-up license to Netlist's patents "having an effective first filing date on or prior to" November 12, 2020.  *See Netlist Inc. v. Samsung Elecs. Co., Ltd.*, No. 20-cv-993, Dkt. 186 at 20-21 (C.D. Cal. Oct. 14, 2021).  On information and belief, Samsung used Netlist's technologies to develop products both in the mature markets such as DDR4 memory modules and the emerging market for new generations of DRAM technologies, including DDR5 and HBMs.  Under the JDLA, Samsung was obligated to supply Netlist certain memory products at competitive prices.  Samsung, however, did not honor its promises and repeatedly failed to fulfill Netlist's product orders.  As a result, Netlist terminated the JDLA on July 15, 2020, which termination was found effective on summary judgment by a federal district court in the Central District of California on October 14, 2021.  *Id.*

27.    Samsung appealed this decision, and the Ninth Circuit partially reversed the summary judgment ruling.  Following remand, the contract action in C.D. Cal. proceeded to a jury

trial.  On May 17, 2024, the jury returned a verdict finding that Netlist's interpretation of the JDLA's supply provision was correct, and Samsung's breach of that provision was material.  On December 26, 2024, the Court granted Samsung's motion for a new trial, and a new trial was held on March 18-21, 2025.  On March 24, 2025, the jury returned a verdict for Netlist.  As a result of this jury verdict, Samsung's license to Netlist's patents was terminated on July 15, 2020.

28.    In April 2023, a jury in the Eastern District of Texas found that Samsung willfully infringed five Netlist patents and awarded Netlist $303.15 million in damages, including $122,775,000 for U.S. Patent Nos. 8,787,060 and 9,318,160—asserted against Samsung's HBM products, and $147,225,000 for U.S. Pat. Nos. 11,016,918 and 11,232,054—asserted against Samsung's DDR5 memory modules.  And in November 2024, a jury found that Samsung willfully infringed three different Netlist patents and awarded Netlist $118 million in damages.  *See Netlist, Inc. v. Samsung Elecs. Co., Ltd.*, No. 2:22-cv-293, Dkt. 847.

29.    Avnet "is one of the largest distributors of electronic components, computer products and embedded technology." Ex. 12. As an authorized distributor of Samsung memory products (Ex. 13), Avnet "accelerates its partners' success by connecting the world's leading technology suppliers with a broad base of customers by providing cost-effective, value-added services and solutions." Ex. 12. Avnet is involved in the use, offering for sale and/or sales of certain semiconductor products, including the Accused Instrumentalities as defined below. Ex. 11.

**E.    High Bandwidth Memory ("HBM")**

30.    HBM is a type of high-speed computer memory technology that relies in part on vertically-stacked memory dies and differs from the DDR4 or DDR5 DIMM formats described in the paragraphs above.  On information and belief, Samsung is a major supplier of HBM.

31.    On information and belief, the Accused HBM Products include, without limitation, any Samsung HBM2, HBM2E, HMB3, HBM3E and newer products (e.g., HBM4) made, sold,

used, offered for sale, and/or imported into the United States by Samsung.  By way of non-limiting example, the accused HBM products include Samsung products marketed as "Aquabolt," "Flashbolt," "Icebolt" or "Shinebolt."  Samsung launched HBM3e in February 2024, and is in the process of qualifying HBM3e with its customers[1]: "A version of Samsung Electronics' (005930.KS), fifth-generation high bandwidth memory (HBM) chips, or HBM3E, has passed Nvidia's (NVDA.O) tests for use in its artificial intelligence (AI) processors."

32.    On information and belief, the Accused HBM Products are compliant with the applicable memory standards promulgated by the Joint Electron Device Engineering Council ("JEDEC").

33.    On information and belief, Samsung's HBM products are comprised of stacked dies interconnected by through silicon vias ("TSVs"), as shown on Samsung's website[2]

**Stacking the Chips and Packaging**
The strategic stacking of 12 layers of 24Gb DRAM chips using Through-Silicon Via (TSV) technology gives the HBM3E astounding bandwidth and an industry-leading 36GB of capacity per layer. This scheme improves capacity by 50% over its 12-layer HBM3 predecessor. The HBM3E and HBM3 chip sizes are compatible with each other, allowing easy transfer of hardware layouts from HBM3 to HBM3E.

## F.    DDR5 Memory Modules

34.    The Accused DDR5 Products include, without limitation, any Samsung DDR5 products made, sold, offered for sale, used and/or imported into the United States by Defendants. By way of non-limiting example, the accused DDR5 memory modules with DFE and ODT/RTT circuitry include Samsung's DDR5 RDIMMs and MRDIMMs.  As further example, the Accused

---

[1] https://www.reuters.com/technology/artificial-intelligence/samsungs-8-layer-hbm3e-chips-clear-nvidias-tests-use-sources-say-2024-08-06/

[2] https://semiconductor.samsung.com/news-events/tech-blog/leading-memory-innovation-with-hbm3e/

Instrumentalities include, without limitation, any DDR5 products made, sold, offered for sale, used and/or imported into the United States by Defendants, including those modules utilizing Samsung's own power management IC, including at least PMIC components having part numbers: S2FPC01, S2FPD01, and S2FPD02.  *See, e.g.*, Ex. 3 (S2FPD01 Product Brief).  The Accused DDR5 Products also include any DDR5 products sold, offered for sale, used and/or imported into the United States by Defendants that include PMICs supplied by third parties.



Registered DIMM



Multiplexed Rank DIMM

Ex. 4 (Samsung Module Handling Guide) at 2.

35.     As seen, each of the DDR5 memory modules includes a plurality of connections at the edge through which command/address signals are received from a memory controller of the host computer system and data is exchanged with the memory controller.  Some modules, such as Samsung's DDR5 RDIMMs, also include a module controller called "RCD."

36.     DDR5 memory modules introduced important upgrades over DDR4 modules.  For example, to accommodate higher data rate, DDR5 introduced a feature called "DFE," or Decision

Feedback Equalizer, to equalize DQ receivers, which, by providing stable, reliable signal integrity

on the module, enables the DQ data eye to open up more, thus enabling higher data rates.



Ex. 5 (Samsung Hot Chips 2021) at 5.

37.    In conjunction with the DFE feature, DDR5 memory modules optimized on-die

termination (ODT) technology to enhance signal integrity. Ex. 6 (DDR5's Secret Weapon: On-

Die Termination), 2 ("By placing a termination resistor that matches the transmission line's

impedance right on the memory chip, on-die termination minimizes the possibility of signal

reflects. Therefore, ODT is a crucial component for high-speed DDR5 memory systems since it

aids in enhancing signal quality, decreasing signal ringing, and eventually allowing for higher data

transfer speeds with less deterioration.").

# On-Die Termination Changes

- All ODT is now fully command/register based
  - No dedicated ODT pin
- ODT is now available for CA bus
  - DQ/DQS still use direct routing from controller to DRAM
  - CA bus uses fly-by routing
- Pin CA_ODT allows different settings for end-of-group
  - Could use 40Ω for end device but ODT disabled for other devices



Ex. 7 at 9.

## IV.    FIRST CLAIM FOR RELIEF – '087 Patent

38.    Netlist re-alleges and incorporates by reference the allegations of the preceding paragraphs of this First Amended Complaint as if fully set forth herein.

39.    On information and belief, Defendants directly infringed and are currently infringing at least one of the approved claims of the '087 Patent by, among other things, making, using, selling, offering to sell, and/or importing within this District and elsewhere in the United States, without authority, the Accused HBM Products, and other products with materially the same structure in relevant part.  For example, and as shown below, the Accused HBM Products and other products with materially the same structure and operating mechanisms in relevant part infringe at least Claim 1 of the '087 Patent.

40.    To the extent the preamble is limiting, the Accused HBM Products are a DRAM package.  On information and belief, the Accused HBM Products each include stacked DRAM dies (*e.g.*, 8, 12, or 16 DRAM dies) including at least a first plurality and second plurality of DRAM dies, with each DRAM die of the stacked DRAM dies including C/A ports, data ports, and

DRAM memory cells, wherein the each DRAM die is configurable to transfer data between the data ports and the DRAM memory cells.  *See, e.g.*, https://semiconductor.samsung.com/news-events/tech-blog/autonomous-driving-and-the-modern-data-center/:



*See also* (https://semiconductor.samsung.com/dram/hbm/hbm3-icebolt/)  ("HBM3 Icebolt stacks 12 layers of 10nm-class 16 Gb DRAM dies for 24GB of memory - an astonishing 1.5 times more than our previous generation."); and (https://www.thelec.net/news/articleView.html?idxno=4788) (Samsung announcing manufacturing of 16H HBM).

41.    On information and belief, the Accused HBM Products also include terminals with command and/or address (C/A) terminals and data terminals, via which the memory package communicates, e.g., control/address signals and data signals in response to the C/A signals, respectively.  For example, the DRAM package is configured to output first data signals in response to a first set of C/A signals associated with a memory read operation, and to receive second data signals in response to a second set of C/A signals associated with a memory write operation.  To illustrate, JEDEC Standard No. 238A provides the following Command Truth Table listing the command and/or address signals associated with a memory read operation and memory write operation:

### 6.3.1    Command Truth Tables (cont'd)

#### Table 31 — Column Commands Truth Table

| Command [4] | Symbol | Clock Cycle | C0 | C1 | C2 | C3 | C4 | C5 | C6 | C7 | Notes |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Column No Operation | CNOP | R | H | H | H | V | V | V | V | V | 1, 2, 3 |
| | | F | V | V | V | V | V | V | V | V | |
| Read | RD | R | H | L | H | L | PC | SID0 / V | SID1 / V | BA0 | 1, 2, 3, 5, 6, 7 |
| | | F | BA1 | BA2 | BA3 | CA0 | CA1 | CA2 | CA3 | CA4 | |
| Read w/ AP | RDA | R | H | L | H | H | PC | SID0 / V | SID1 / V | BA0 | 1, 2, 3, 5, 6, 7 |
| | | F | BA1 | BA2 | BA3 | CA0 | CA1 | CA2 | CA3 | CA4 | |
| Write | WR | R | H | L | L | L | PC | SID0 / V | SID1 / V | BA0 | 1, 2, 3, 5, 6 |
| | | F | BA1 | BA2 | BA3 | CA0 | CA1 | CA2 | CA3 | CA4 | |
| Write w/ AP | WRA | R | H | L | L | H | PC | SID0 / V | SID1 / V | BA0 | 1, 2, 3, 5, 6 |
| | | F | BA1 | BA2 | BA3 | CA0 | CA1 | CA2 | CA3 | CA4 | |
| Mode Register Set | MRS | R | L | L | L | MA4 | OP5 | OP6 | OP7 | MA0 | 1, 3, 8, 9 |
| | | F | MA1 | MA2 | MA3 | OP0 | OP1 | OP2 | OP3 | OP4 | |

NOTE 1   BA = Bank Address; CA = Column Address; PC = Pseudo Channel 0 or 1; SID = Stack ID; MA = Mode Register Address; V = Valid Signal (either H or L, but not floating).

NOTE 2   C[7:0] must be driven to a valid signal level even if a stack ID address (SID) is not defined for a specific density, or if parity is disabled in the mode register. APAR must be driven to a valid signal level even if CA parity is disabled in MR0 OP6. C[7:0] are Don't Care when the device is in power-down or self refresh.

NOTE 3   Parity is evaluated on all pins if CA parity is enabled in MR0 OP6.

NOTE 4   All other command encodings not shown in the table are reserved for future use.

NOTE 5   PC = 0 selects pseudo channel 0 (PC0), and PC = 1 selects pseudo channel 1 (PC1). The pseudo channel not selected by PC performs a CNOP.

NOTE 6   The SID bits act as bank address bits in conjunction with READ and WRITE commands, and related timing diagrams shall be interpreted accordingly. All other column commands do not use SID. Refer to the channel addressing table for HBM3 configurations using SID.

NOTE 7   HBM3 configurations using the SID specify a timing parameter $t_{CCDS}$ for consecutive READs to different SID. Vendor datasheets should be consulted for details.

NOTE 8   All mode registers are write-only by default using the MRS command.

NOTE 9   Refer to the HBM3 Mode Register Overview table for MA4 of MRS.

42.    On information and belief, the Accused HBM Products further include die interconnects including C/A interconnects and data interconnects, the C/A interconnects including at least first C/A interconnects and second C/A interconnects, the first C/A interconnects configured to conduct the first set of C/A signals and the second set of C/A signals, the data interconnects including at least first data interconnects and second data interconnects, the first data interconnects configured to conduct the first data signals and the second data signals, each of the die interconnects including one or more through silicon vias (TSVs) in one or more DRAM dies in the stacked DRAM dies and configured to conduct signals to and/or from the one or more DRAM dies in the stacked DRAM dies through the one or more TSVs.  *See, e.g.*, https://semiconductor.samsung.com/news-events/tech-blog/leading-memory-innovation-with-

hbm3e/.  ("The strategic stacking of 12 layers of 24Gb DRAM chips using Through-Silicon Via (TSV) technology gives the HBM3E astounding bandwidth and an industry-leading 36GB of capacity per layer. This scheme improves capacity by 50% over its 12-layer HBM3 predecessor."); https://semiconductor.samsung.com/news-events/tech-blog/autonomous-driving-and-the-modern-data-center/("HBM employs stacks of vertically interconnected DRAM chips, supports 1,024 I/Os and implements Through Silicon Via (TSV) technology, where connections between die are achieved through thousands of copper-filled holes functioning as wires with alternating layers of external microbumps.").

43.     On information and belief, the Accused HBM Products also include a control die (also known as a "buffer die" or "logic die") coupled between the terminals and the stacked DRAM dies.  The control die includes conduits including C/A conduits and data conduits, the C/A conduits including at least first C/A conduits coupled to respective ones of the first C/A interconnects and second C/A conduits coupled to respective ones of the second C/A interconnects, the data conduits including at least first data conduits coupled to respective ones of the first data interconnects and second data conduits coupled to respective ones of the second data interconnects.

44.     On information and belief, the Accused HBM Products also have C/A interconnects in the claimed configuration.  For example, a first C/A interconnect of the first C/A interconnects is in electrical communication with corresponding C/A ports on the first plurality of DRAM dies and not with any C/A port on any of the second plurality of DRAM dies.  Similarly, a second C/A interconnect of the second C/A interconnects is in electrical communication with corresponding C/A ports on the second plurality of DRAM dies and not with any C/A port on any of the first plurality of DRAM dies.

45.     On information and belief, the Accused HBM Products also have data interconnects in the claimed configuration.  For example, a first data interconnect of the first data interconnects

is in electrical communication with corresponding data ports on the first plurality of DRAM dies and not with any data port on any of the second plurality of DRAM dies.  Further, each of the first data interconnects includes a first respective set of TSVs including a TSV in each DRAM die of the first plurality of DRAM dies and at least one TSV in at least one DRAM die of the second plurality of DRAM dies, wherein the TSV in the each DRAM die of the first plurality of DRAM dies is in electrical communication with a corresponding data port on the each DRAM die, and wherein the at least one TSV in the at least one DRAM die of the second plurality of DRAM dies is not in electrical communication with any data port on the at least one DRAM die.  Similarly, a second data interconnect of the second data interconnects is in electrical communication with data ports on the second plurality of DRAM dies and not with any data port on any of the first plurality of DRAM die.  For example, as depicted below, some TSVs appear to only electrically interconnect to some of the dies in the stack, while others may electrically bypass certain groups of dies[3]:

---

[3] https://semiconductor.samsung.com/us/news-events/tech-blog/the-perfect-harmony-created-by-samsung-hbm-powering-the-ai-era/.



46.    Additionally, on information and belief, the data conduits in the control die include a first conduit of the first data conduits coupled between the first data interconnect and a first data terminal of the data terminals (e.g., one or more data terminals), and a second conduit of the second data conduits coupled between the second data interconnect and the first data terminal (e.g., one or more data terminals).  The control die also includes control logic configurable to control respective states of the first and second conduits in response to one or more C/A signals received via one or more of the C/A terminals, wherein the one or more C/A signals do not include any chip select signal (e.g., as shown above in the Command Truth Table of JESD 238A).

47.    On information and belief, the Accused HBM Products further include first and second unidirectional die interconnects, for example, respective TSVs associated with unidirectional differential data strobes RDQS_t/RDQS_c and WDQS_t/WDQS_c.  *See, e.g.*, JESD 238A, ("Data referenced to unidirectional differential data strobes RDQS_t/RDQS_c and WDQS_t/WDQS_c."); *id.* (reproduced below).  For example, the control die is configured to receive signals from one or more DRAM dies of the stacked DRAM dies via the first unidirectional

interconnects (*e.g.*, RDQS_t/RDQS_c in response to the first set of C/A signals) and is not configured to drive any signal to any of the stacked DRAM dies via any of the first unidirectional interconnects.  As further example, the control die is configured to drive signals to one or more DRAM dies of the stacked DRAM dies via the second unidirectional interconnects (e.g., WDQS_t/WDQS_c in response to the second set of C/A signals) and is not configured to receive any signal from any of the stacked DRAM dies via any of the second unidirectional interconnects.

| 6 | Operation |
|---|---|

## 6.1    HBM3 Clocking Overview

The HBM device captures commands and addresses on the row and column buses using a differential clock CK_t/CK_c. Both buses operate at double data rate (DDR).

The HBM device has uni-directional differential Write strobes (WDQS_t/WDQS_c) and Read strobes (RDQS_t/RDQS_c) per 32DQ(DWORD). The data bus operates at double data rate (DDR).

HBM3 utilizes two types of clock with different frequencies. The strobe frequency is twice the frequency of the command clock, requiring an HBM3 to have reset-type clock-divider in the WDQS clock tree (Figure 10). By dividing the WDQS, the operation speed of DRAM internal circuits in WDQS domain is reduced to half. The direction of the internal WDQS/2 transition may vary depending on vendor's choice. Command clock and WDQS are generated from same PLL and RDQS clock is generated from WDQS. WDQS internal divider is initialized to be a pre-defined internal divider state after Self Refresh exit or Power-up or Power down exit sequence. The sum of preamble and postamble for both READ and WRITE operation is required to be an even number so that the internal divider's state, phase of internal WDQS/2, is maintained. Therefore, HBM3 WDQS does not require a specific sync operation before READ and WRITE operations. WDQS starts toggling before starting WRITE or READ operations for reducing ISI. During inactivity, WDQS/ RDQS are required to be static (WDQS/RDQS_t is Low, WDQS/RDQS_c is High). When WRITE training for unmatched DQ/DQS path, DQ should be shifted to align phase to the point where CK and WDQS are in sync.



Figure 10 — High Level Block Diagram Example of Clocking Scheme

48.     On information and belief, Samsung also indirectly infringes the '087 Patent, as provided in 35 U.S.C. § 271(b), by inducing infringement by others, such as Samsung's customers and end users, in this District and elsewhere in the United States.  For example, on information and belief, Samsung has induced, and currently induces, the infringement of the '087 Patent through its affirmative acts of selling, offering to sell, distributing, and/or otherwise making available the Accused HBM Products and other materially similar products that infringe the '087 Patent.   On information and belief, Samsung provides specifications, datasheets, instruction manuals, and/or other materials that encourage and facilitate infringing use of the Accused HBM Products and other materially similar products by users in a manner that it knows or should have known would result in infringement and with the intent of inducing infringement. On information and belief, Samsung is encouraging and facilitating infringement of the '087 Patent by others. For example, on information and belief, Samsung sells or otherwise provides the Accused HBM

Products to distributors or U.S.-based sales entities knowing that these entities intend to make, use, offer to sell, and/or sell the products within the United States and/or import the products into the United States in an infringing manner.

49.    On information and belief, Samsung also indirectly infringes the '087 Patent, as provided in 35 U.S.C. § 271(c), contributing to direct infringement committed by others, such as customers and end users, in this District and elsewhere in the United States.  For example, on information and belief, Samsung has contributed to, and currently contributes to, Samsung's customers and end-users infringement of the '087 Patent through its affirmative acts of selling and offering to sell, either directly or through its distributors, in this District and elsewhere in the United States, the Accused HBM Products and other materially similar products that infringe the '087 Patent.  On information and belief, the Accused HBM Products and other materially similar products have no substantial noninfringing use, and constitute a material part of the patented invention.  On information and belief, Samsung is aware that the product or process that includes the Accused HBM Products and other materially similar products may be covered by one or more claims of the '087 Patent.  On information and belief, the use of the product or process that includes the Accused HBM Products and other materially similar products infringes at least one claim of the '087 Patent.

50.    Samsung's infringement of the '087 Patent has damaged and will continue to damage Netlist.  Samsung has had actual notice of the '087 Patent since at least the filing of the original Complaint.  Samsung's infringement of the '087 Patent has been continuing and willful.  Samsung continues to commit acts of infringement despite a high likelihood that its actions constitute infringement, and Samsung knew or should have known that its actions constituted an unjustifiably high risk of infringement.

## V.    SECOND CLAIM FOR RELIEF – '731 Patent

51.    Netlist re-alleges and incorporates by reference the allegations of the preceding paragraphs of this First Amended Complaint as if fully set forth herein.

52.    On information and belief, Defendants directly infringed and are currently infringing at least one claim of the '731 Patent by, among other things, making, using, selling, offering to sell, and/or importing within this District and elsewhere in the United States, without authority, the accused DDR5 DIMMs with DFE and ODT/RTT circuitry, such as RDIMMs and MRDIMMs, and other products with materially the same structures in relevant parts.  For example, and as shown below, the accused DDR5 RDIMMs and other products with materially the same structures in relevant parts infringe at least one claim of the '731 Patent.

53.    For example, the accused DDR5 RDIMMs are memory modules "operable to communicate data with a system memory controller via a memory bus in response to address and control signals from the system memory controller" and comprise "a printed circuit board comprising at least one connector configured to be operatively coupled to the memory bus, the at least one connector including a plurality of edge connections distributed along one or more edges of the printed circuit board":




Ex. 8.

54.    As shown above and below, the accused DDR5 RDIMMs comprise "a plurality of memory devices on the printed circuit board," e.g., Samsung DDR5 SDRAMs arranged in multiple

ranks ("the plurality of memory devices being arranged in multiple ranks, each rank comprising an independent set of memory devices that can be accessed by the system memory controller to access a full bit-width of the memory bus").



Ex. 9 (A Novel Simulation Methodology Reflecting System Power Scenario using a Markov-Chain-based Stochastic Random Power Model), at 931.

55.    By way of further example, the accused DDR5 RDIMMs comprise "at least one circuit coupled between the at least one connector and the plurality of memory devices, the at least one circuit comprising a first set of port connections coupled to respective ones of the plurality of edge connections and a second set of port connections coupled to the plurality of memory devices, each circuit of the at least one circuit further comprising a set of correction circuits, each correction circuit of the set of correction circuits being configured to make corrections in one or more signals transmitted between a respective port connection of the first set of port connections and a corresponding port connection in the second set of port connections, the each correction circuit of the set of correction circuits including at least one programmable impedance matching circuit":



Ex. 5 (Samsung Hot Chips 2021) at 5.

# Decision Feedback Equalization

- Approximate **linear equalization** with FIR filter
  - Only **linear** stages (delay and scaling)
- Typical pros/cons of DFE
  - No amplification of **noise** (such as CTLE)
  - **No pre-cursor** equalization
- Remove **scaled interference** from four previous bits
  - Based on the channel impulse response
  - Four bits in a 4-tap DFE



Ex. 7, at 15.

# On-Die Termination Changes

- All ODT is now fully command/register based
  - No dedicated ODT pin
- ODT is now available for CA bus
  - DQ/DQS still use direct routing from controller to DRAM
  - CA bus uses fly-by routing
- Pin CA_ODT allows different settings for end-of-group
  - Could use 40Ω for end device but ODT disabled for other devices



Ex. 7 at 9. On information and belief, the DFE and ODT circuit are not part of the memory device.

56.     Each "DDR5 device" on the memory module includes a memory device comprising memory cores and peripheral circuitry such as DDR5-specific DFE and ODT/RTT circuits, which is each a correction circuit including at least one programmable impedance matching circuit. The collection of the DFE and ODT/RTT circuits forms a set of correction circuits. Each DFE and ODT/RTT circuit associated with a DQ line is configured to make corrections in one or more DQ signals transmitted between a respective port connection (*e.g.*, one for a data or DQ signal line) of the first set of port connections connected to the edge connector and a corresponding port connection for a DDR5 memory device in the second set of port connections.

57.     By way of further example, as shown above and below, the accused DDR5 RDIMMs comprise "control circuitry" "configured to receive the address and control signals from the system memory controller and to control the plurality of memory devices in response to the address and control signals, wherein the control circuitry is further configured to dynamically control the at least one programmable impedance matching circuit in the each correction circuit of the set of correction circuits in the each circuit of the at least one circuit based on which of the

multiple ranks is selected to communicate data with the system memory controller in response to the address and control signals." For example, on information and belief, the control circuitry is configured to receive the address and control signals from the memory controller and to output appropriate address and control signals based on the received address and control signals for controlling the plurality of memory devices in response to the address and control signals received from the system memory controller, as shown below:



Ex. 10 (Recent Evolution in the DRAM Interface: Mile-Markers Along Memory Lane), at 18-19 ("In a later effort to shorten and simplify the overall command/address/control and clock signal paths, a register was introduced on the registered DIMM to intercept and retransmit those signals out to the DRAMs, resulting in a substantial signal margin increase at each DRAM location"). By further example, on information and belief, the control circuitry is further configured to dynamically control the at least one programmable impedance matching circuit (ODT/RTT) of the set of correction circuits because the RTT value of the targeted rank is set based on the address and control signal received, such as the chip select signals that determine the ranks to be accessed and that in DDR5 encodes the ODT signal. The control circuitry receives address and control signals from the memory controller, processes the input address and control signals to appropriate output command/signals (including converting double rated input command/address signals to single rated signals as needed and converting input chip selects to appropriate outputs), and outputs the converted address and control signals to the DDR5 devices.

58.     On information and belief, Defendants also indirectly infringe the '731 Patent, as provided in 35 U.S.C. § 271(b), by inducing infringement by others, such as Defendants' customers and end users, in this District and elsewhere in the United States.  For example, on information and belief, Defendants have induced, and currently induce, the infringement of the '731 Patent through its affirmative acts of selling, offering to sell, distributing, and/or otherwise making available the accused DDR5 products and other materially similar products that infringe the '731 Patent.  On information and belief, Defendants provide specifications, datasheets, instruction manuals, and/or other materials that encourage and facilitate infringing use of the accused DDR5 memory modules and other materially similar products by users in a manner that it knows or should have known would result in infringement and with the intent of inducing infringement. On information and belief, Samsung is encouraging and facilitating infringement of the '731 Patent by others. For example, on information and belief, Samsung sells or otherwise provides the Accused Products to distributors or U.S.-based sales entities, including but not limited to, Avnet, knowing that these entities intend to make, use, offer to sell, and/or sell the products within the United States and/or import the products into the United States in an infringing manner. Ex. 11.

59.     On information and belief, Defendants also indirectly infringe the '731 Patent, as provided in 35 U.S.C. § 271(c), contributing to direct infringement committed by others, such as customers and end users, in this District and elsewhere in the United States.  For example, on information and belief, Defendants have contributed to, and currently contribute to, Defendants' customers and end-users infringement of the '731 Patent through its affirmative acts of selling and offering to sell, either directly or through its distributors, in this District and elsewhere in the United States, the accused DDR5 memory modules and other materially similar products that infringe the '731 Patent.  On information and belief, the accused DDR5 products and other

materially similar products have no substantial noninfringing use, and constitute a material part of the patented invention. On information and belief, Defendants are aware that the product or process that includes the accused DDR5 products and other materially similar products may be covered by one or more claims of the '731 Patent. On information and belief, the use of the product or process that includes the accused DDR5 products and other materially similar products infringes at least one claim of the '731 Patent.

60.    Samsung's infringement of the '731 Patent has damaged and will continue to damage Netlist. Samsung has had actual notice of the '731 Patent since at least August 2, 2021. Samsung's infringement of the '731 Patent has been continuing and willful. Samsung continues to commit acts of infringement despite a high likelihood that its actions constitute infringement, and Samsung knew or should have known that its actions constituted an unjustifiably high risk of infringement.

61.    Avnet's infringement of the '731 Patent has damaged and will continue to damage Netlist. Avnet has had actual notice of the '731 Patent at least as early as the filing of this First Amended Complaint. Avnet's infringement of the '731 Patent has been continuing and willful. Avnet continues to commit acts of infringement, including advertising, marketing, offering to sell and/or selling the Accused Products, despite a high likelihood that its actions constitute infringement, and Avnet knew or should have known that its actions constituted an unjustifiably high risk of infringement.

## VI.    DEMAND FOR JURY TRIAL

62.    Pursuant to Federal Rule of Civil Procedure 38(b), Netlist hereby demands a trial by jury on all issues triable to a jury.

## VII. <u>PRAYER FOR RELIEF</u>

WHEREFORE, Netlist respectfully requests that this Court enter judgment in its favor ordering, finding, declaring, and/or awarding Netlist relief as follows:

A.      that Defendants infringe the Patents-in-Suit;

B.      all equitable relief the Court deems just and proper as a result of Defendants' infringement;

C.      an award of damages resulting from Defendants' acts of infringement in accordance with 35 U.S.C. § 284;

D.      that Samsung's infringement of the Patents-in-Suit is willful;

E.      that Avnet's infringement of the '731 Patent is willful;

F.      enhanced damages pursuant to 35 U.S.C. § 284;

G.      that this is an exceptional case and awarding Netlist its reasonable attorneys' fees pursuant to 35 U.S.C. § 285;

H.      an accounting for acts of infringement and supplemental damages, without limitation, prejudgment and post-judgment interest; and

I.      in the alternative to an award of damages under 35 U.S.C. § 284, an order pursuant to 35 U.S.C. § 283 permanently enjoining Defendants, its distributors, officers, agents, servants, employees, attorneys, instrumentalities and those persons in privity, active concert or participation with them, from further acts of direct and/or indirect infringement of the Patents-in-Suit including the manufacture, sale, offer for sale, importation and use of the infringing products.

J.      such other equitable relief which may be requested and to which Netlist is entitled.

Dated: July 8, 2025

Respectfully submitted,

/s/ Jennifer L. Truelove

Samuel F. Baxter
Texas State Bar No. 01938000
sbaxter@mckoolsmith.com
Jennifer L. Truelove
Texas State Bar No. 24012906
jtruelove@mckoolsmith.com
**MCKOOL SMITH, P.C.**
104 East Houston Street Suite 300
Marshall, TX 75670
Telephone: (903) 923-9000
Facsimile: (903) 923-9099

Jason G. Sheasby (*pro hac vice* forthcoming)
jsheasby@irell.com
Lisa S. Glasser (*pro hac vice* forthcoming)
lglasser@irell.com
Andrew J. Strabone (*pro hac vice* forthcoming)
astrabone@irell.com
Annita Zhong, PhD (*pro hac vice* forthcoming)
hzhong@irell.com
Thomas C. Werner (*pro hac vice* forthcoming)
twerner@irell.com
Michael W. Tezyan (*pro hac vice* forthcoming)
mtezyan@irell.com

**IRELL & MANELLA LLP**
1800 Avenue of the Stars, Suite 900
Los Angeles, CA 90067
Tel. (310) 277-1010
Fax (310) 203-7199

*Attorneys for Plaintiff Netlist, Inc.*